UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
INTEGRATED SYSTEMS AND POWER, INC.,

                       Plaintiff                 09 CV 5874 (RPP)

       - against -

                                             **OPINION AND ORDER**

HONEYWELL INTERNATIONAL, INC.,

                       Defendant.
-----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       By motion dated August 17, 2009, Defendant Honeywell International, Inc.

("Defendant" or "Honeywell") moves to dismiss Plaintiff Integrated Systems & Power,

Inc.'s ("Plaintiff" or "ISPI") complaint pursuant to Rule 12(b)(6) for failure to state a

claim upon which relief may be granted.  On September 21, 2009, Plaintiff filed its

opposition to Defendant's motion and on October 13, 2009, Defendant filed its reply in

further support of its motion to dismiss.  The Court heard oral argument on November 20,

2009.  For the reasons discussed herein, Defendant's motion is granted and Plaintiff's

complaint is dismissed without prejudice.


**I.  Facts**

       Plaintiff ISPI is a corporation engaged in the business of selling, installing and

servicing fire-detection and alarm systems, including NOTIFIER systems manufactured

by Defendant Honeywell.  (Compl. ¶ 6.)[1]  Through the NOTIFIER division of its Fire

Solutions Group, Honeywell manufactures commercial fire alarm systems, as well as

---

[1]       All facts recited in this opinion are drawn from Plaintiff's complaint, which are assumed to be true
for the purposes of a motion to dismiss under Rule 12(b)(6).

related technology, peripheral devices and accessories.  (Id. ¶ 7.)  From January 2002 until July 2009, ISPI was a non-exclusive authorized distributor of Honeywell's NOTIFIER fire-detection alarm system.  (Id. ¶¶ 9, 26.)  Pursuant to a NOTIFIER Engineered Systems Distributor Agreement dated November 5, 2001 and later pursuant to a successor agreement dated July 1, 2003 (the "Distributor Agreement"), Honeywell authorized ISPI to market, sell, install and service Honeywell's NOTIFIER fire-detection and alarm system products, with New York City as ISPI's "territory" or "primary trading area."  (Id. ¶¶ 9-10.)  The Distribution Agreement contained no limitation on the entities to which ISPI was authorized to sell products and/or services.  (Id. ¶ 14.)

As an authorized NOTIFIER distributor, ISPI sold only NOTIFIER fire-detection and alarm systems.  (Id. ¶ 12.)  On the other hand, after ISPI became a NOTIFIER distributer, in addition to servicing NOTIFIER systems, ISPI continued to provide service to its pre-existing portfolio of customers with Simplex fire-detection alarm systems – a brand competing with NOTIFIER.  (Id. ¶ 13.)

During its time as an authorized distributor, ISPI submitted bids on a number of NOTIFIER service contracts, where the client's system had been sold, installed and/or previously serviced by a different NOTIFIER authorized distributor.  (Id. ¶¶ 19-24.)  ISPI frequently submitted the lowest bid for such service contracts.  In some cases ISPI successfully obtained the contracts in question (id. ¶¶ 20(d), 23, 24); in some cases it was unsuccessful and the client remained with the "incumbent" distributor despite ISPI's lower bid.  (id. ¶¶ 20(a),(b)).  Other dealers, against whom ISPI was bidding for service contracts, complained to Honeywell about ISPI's bidding practices, and Honeywell in turn warned ISPI on a number of occasions that such low-ball bidding was a problem.

(Id. ¶¶ 19-23, 25, 28.)  Honeywell instructed ISPI not to bid for service contracts against other authorized NOTIFIER distributors and told ISPI that Honeywell "expects [ISPI] to cooperate and not bid." (Id. ¶ 20(d).)

At a meeting among NOTIFIER distributors on April 28, 2009, shortly after ISPI was awarded a contract with the United States Postal Service for fire alarm maintenance at 13 postal service sites, other NOTIFIER distributers besides ISPI again complained to Honeywell about ISPI's practice of bidding against other authorized NOTIFIER distributors.  (Id. ¶¶ 24, 25.)  The distributors pressured Honeywell to terminate ISPI as an authorized distributor and, in response to the distributors' requests, demands and/or threats, Honeywell agreed to terminate its Distributor Agreement with ISPI.  (Id. ¶ 25.)

By letter dated June 4, 2009, Honeywell gave notice to ISPI that it would terminate ISPI's distributorship without cause on 30 days notice, effective July 6, 2009 in accordance with the terms of the Distributor Agreement.  (Id. ¶¶ 11, 26.)  In two telephone conversations between representatives of ISPI and Honeywell on June 8 and 16, 2009, Honeywell told ISPI that it terminated ISPI because of ISPI's practice of bidding for service contracts against other distributors and referenced examples of ISPI's bidding, complaints from other distributors and previous warnings given by Honeywell to ISPI.  (Id. ¶ 28.)

## II.  Plaintiff's Antitrust Allegations

Plaintiff alleges that NOTIFIER distributors, other than ISPI, agreed among themselves to engage in the conduct complained of: (i) to allocate customers; (ii) to not compete for service contracts; (iii) to submit non-competitive bids; and (iv) to complain

to Honeywell about ISPI's low bids on service contracts.  (Compl. ¶¶ 1, 15, 25.)  Plaintiff also alleges that the purpose and/or effect of the agreement was eliminating or substantially reducing price competition.  (Id. ¶¶ 1, 17.)  Plaintiff further alleges that Honeywell was and is an active participant in the agreement among the distributors, that Honeywell knowingly aided and abetted the distributors' agreement, and that Honeywell terminated ISPI's distributorship as part of the distributors' agreement and in response to complaints by distributors.  (Id. ¶¶ 16, 25, 27)

In its complaint, Plaintiff lists the relevant product market as "the sale, installation and servicing of NOTIFIER fire-detection and alarm system products" and the relevant geographic market as New York City.  (Id. ¶ 8.)  Plaintiff asserts that the alleged agreement among the NOTIFIER distributors constitutes a horizontal conspiracy (id. ¶¶ 1, 16, 18, 27), and that such conduct constitutes a *per se* violation of Section 1 of the Sherman Act (id. ¶¶ 29-33).  In the alternative, if the alleged conspiracy is not deemed to be a *per se* violation, Plaintiff asserts that the complained of conduct is unlawful under the rule of reason because the anticompetitive effects of Honeywell's conduct outweigh the pro-competitive effects, if any.  (Id. ¶¶ 34-37.)

### III.  Discussion

Defendant moves to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Generally, a complaint must merely contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In recent years the Supreme Court has clarified and refined the appropriate pleading standard:

> Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief.  Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 n.3 (2007).  The Supreme Court recognized the "threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'show that the pleader is entitled to relief.'"  Id. at 557.  Courts "do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Id. at 570.  In determining whether a complaint states a claim to relief that is plausible on its face, a court "must take all of the factual allegations in the complaint as true," but is "not bound to accept as true a legal conclusion couched as a factual allegation."  Ashcroft v. Iqbal, ___ U.S. ____, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

**A.  Per Se Analysis**

The primary point of dispute between the parties is whether the complaint has alleged conduct that is properly analyzed under the *per se* rule for Sherman Act violations or under the so-called "rule of reason."  While Plaintiff repeatedly asserts that Defendant's conduct constitutes a "horizontal conspiracy," and therefore is a *per se* violation, this characterization is a legal conclusion that the Court does not accept as true on a motion to dismiss.  Therefore, as a threshold question, the Court must determine whether the complaint adequately alleges a horizontal conspiracy, as Plaintiff claims.

The Supreme Court has stated that "[i]t is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman

Act."  United States v. Topco Assocs., Inc., 405 U.S. 596, 607-08 (1972).  It has long

been recognized that agreements between competitors at the same level of the market

structure to allocate territories, fix prices or otherwise minimize competition – referred to

as "horizontal restraints" – are classic examples of *per se* violations of § 1 of the Sherman

Act.  See id. at 608.  Conversely, agreements between persons at different levels of a

market structure, for example between manufacturer and distributor or between

franchisor and franchisee – referred to as "vertical restraints" – are analyzed under the

rule of reason.  See Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58-59 (1977)

(holding non-price vertical restrictions are analyzed under the rule of reason); see also

Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 907 (2007) (holding

vertical price restraints are judged according to the rule of reason).

Without question, the conduct complained of in this case includes both horizontal

and vertical components.  Plaintiff alleges that the agreement at issue is one among the

NOTIFIER distributors, other than ISPI, and is therefore a horizontal conspiracy.  But the

specific action ISPI alleges that Honeywell took (which ISPI alleges harmed both ISPI

and competition generally) was Honeywell's termination of ISPI as an authorized

NOTIFIER distributor.  The termination of a distributor by a manufacturer is

unquestionably a restriction or restraint between actors at different levels of the supply

chain, i.e., a vertical restraint.  ISPI argues that the termination of ISPI by Honeywell was

in response to and in furtherance of a horizontal conspiracy among NOTIFIER

distributors, and therefore urges the Court to treat the conduct complained of collectively

as one horizontal conspiracy and apply the *per se* rule.  For the reasons discussed below,

under controlling Supreme Court and Second Circuit precedent, ISPI's argument is unpersuasive.

1.  Vertical Restraints Resulting from Dealer Complaints

In Oreck Corp. v Whirlpool Corp., 579 F.2d 126 (2d Cir. 1978) (en banc), cert. denied, 439 U.S. 946 (1978), the Second Circuit, sitting en banc, held that a manufacturer's decision to discontinue the distributorship of one distributor in accordance with the terms of their contract is judged under the rule of reason, even when the manufacturer's decision came at the "behest and insistence" of another distributor. Id. at 128, 133-34.  The court rejected Oreck's argument that "the elimination of its distributorship amounted to tampering with the price structure" and should therefore be construed as a *per se* violation, id. at 130-31, and noted that "[i]t has always been the prerogative of a manufacturer to decide with whom it will deal" id. at 133 (citing United States v. Colgate & Co., 250 U.S. 300 (1919)).

Ten years later, in Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717 (1988), the United States Supreme Court reached a similar conclusion, holding that "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels," Id. at 735-36, even when the vertical restraint – in that case, the termination of a dealership – came about as a result of price complaints from a competing dealer, id. at 721.  In Business Electronics, the pressure from the complaining dealer was even greater than the complaints from NOTIFIER distributors alleged here, specifically, the complaining dealer "gave respondent the ultimatum that [he] would terminate his dealership unless respondent ended its relationship with petitioner within 30 days."  Id.

In Business Electronics the Supreme Court emphasized the principle that "there is a presumption in favor of a rule-of-reason standard." Id. at 726 (citing Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977) and Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984)).  While vertical restraints, such as a manufacturer terminating a distributor, have the potential to restrain intrabrand competition, they also have "real potential to stimulate interbrand competition," which is "the primary concern of antitrust law." Id. at 724, 726.

Here, just as in Business Electronics and Oreck, the restraint that allegedly restricted competition and harmed ISPI (Honeywell's termination of ISPI) was a vertical restraint imposed by a manufacturer against a distributor that allegedly came about as a result of price complaints from competing distributors, and should be evaluated under the rule of reason like those cases.  Plaintiff attempts to distinguish Business Electronics and Oreck, arguing that ISPI's termination was not merely the result of dealer complaints, but the result of a horizontal conspiracy among NOTIFIER distributors to eliminate competition and rig bids.  For the reasons discussed below, Plaintiff's argument is unpersuasive.

2.  Horizontal Conspiracy

ISPI cites United States v. General Motors Corp., 384 U.S. 127 (1966), for the proposition that a manufacturer's participation in a horizontal conspiracy among its dealers is a *per se* violation.  In General Motors, the United States brought a civil suit against General Motors for conspiracy to restrain trade in violation of § 1 of the Sherman Act.  After trial, the district court concluded that the proof failed to establish a violation,

and on direct appeal, the United States Supreme Court reversed.  The government argued that General Motors and its dealers engaged in a concerted effort to eliminate so-called "discounters" from the market for Chevrolet cars sold in the Los Angeles area.  Certain dealers developed relationships with discounters that took various forms, but in substance amounted to providing cars to discounters at a small markup over the factory invoice price, allowing the discounters in turn to sell to customers at "bargain" prices relative to authorized dealers.  Id. at 130-31.  This high-volume, low-margin business was profitable to the dealers who worked with discounters, but damaging to the business of authorized dealers as a whole, and the practice generated concerns and complaints from dealers in the Los Angeles area.  Id. at 133-34.  Dealers who worked with discounters were understandably hesitant to give up the practice for fear that if they did, other dealers would merely pick up where they left off.  Id.  In response to complaints from dealers, General Motors solicited and obtained agreements from each dealer not to do business with discounters.  Id. at 136.  Together, General Motors, dealers and trade associations (comprised of member dealers) policed the new agreements using professional investigators to pose as customers of the discounters.  Id. at 136-37.  Once the investigators obtained evidence that one dealer was doing business with discounters, in violation of its agreement with General Motors, General Motors confronted the offending dealer and offered that dealer the opportunity to repurchase the car previously sold through a discounter, sometimes at a substantial loss to the dealer.  Id. at 137-38.  In every case the "embarrassed" dealer repurchased the car and "promised to stop such sales."  Id. at 137.  The Supreme Court found that the conduct of General Motors and the

defendant dealer associations constituted a *per se* violation of § 1 of the Sherman Act.  Id. at 145.

The conduct at issue in ISPI's complaint, however, lacks two key horizontal characteristics that were involved in General Motors.  First, in General Motors, not only did the associations of dealers agree to attempt to eliminate discounters, the dealers themselves actively policed the agreements not to deal with discounters.  Id. at 141.  Specifically, the dealer associations created a "joint investigating committee" and jointly financed the investigation and policing of the agreements.  Id. at 137, 141.  Conversely, in this case, the only "enforcement" or "policing" action was Honeywell's termination of ISPI as an authorized dealer in accordance with the terms of ISPI's contract.  ISPI's termination was undertaken unilaterally and in the sole discretion of Honeywell.  While ISPI goes to great length to argue that its termination was in response to complaints from other NOTIFIER authorized dealers, the fact remains that any complaints were vertical in nature (from dealers to manufacturer) and any resulting action by Honeywell was likewise vertical in nature (termination of dealer by manufacturer).

Second, in General Motors, the discounters who were eliminated from the market through the horizontal conspiracy among authorized Chevrolet dealers relied on the dealers in order to obtain cars to sell at a discount.  While General Motors' solicitations of explicit agreements from individual dealers not to do business with discounters helped cement the horizontal conspiracy in place, it was the agreement *among the dealers* to cease doing business with discounters that froze the discounters out of the market.  Therefore, the Supreme Court ultimately concluded that the conduct of General Motors and the dealer associations was a *per se* violation as a joint refusal to deal or a group

boycott.  Citing Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211 (1959), the

Supreme Court reasoned that a "group boycott of even a single trader violated [the

Sherman Act] without regard to the reasonableness of the conduct in the circumstances."

General Motors, 384 U.S. at 145-46.

Here, unlike in General Motors, the other authorized NOTIFIER distributors who

are alleged to have engaged in a horizontal conspiracy did not refuse to deal with or

boycott ISPI.  Indeed, the other distributors had no direct ability to influence whether

ISPI could participate in the market.  Assuming the facts in the light most favorable to

ISPI, the actions taken by NOTIFIER distributors that eventually resulted in ISPI's

termination were the act of complaining to Honeywell.  The mere act of complaining,

even if undertaken by more than one distributor, is a far cry from the horizontal

conspiracy involving a group boycott and refusal to deal that the Supreme Court

recognized as a *per se* violation in General Motors.

Plaintiff's reliance on United States v. Topco Associates, Inc., 405 U.S. 596

(1972), fares no better.  Topco was a trade association comprised of various regional

grocery chains that acted as a purchasing cooperative for private-label products.  Topco

allocated geographic territories among its members and controlled whether new members

would be admitted into the cooperative.  Because an 85% vote was required to admit a

new member when the existing member whose operations were closest to those of the

proposed new member voted against admission, the procedure for approval provided

members with "a veto of sorts over actual or potential competition in the territorial areas

in which they are concerned."  Id. at 602.  Most licenses granted to members were

exclusive and the Supreme Court noted that "[w]hen combined with each member's veto

11

power over new members, provisions for exclusivity work effectively to insulate members from competition in Topco-brand goods." Id.  The Supreme Court held that the restriction on competition in Topco was a horizontal restraint because the exclusive geographic market allocations and the restrictions on entry imposed by Topco were effectively restrictions imposed horizontally by the member grocery chains because Topco was wholly owned and operated by its member licensees.  Id. at 609 (citing United States v. Sealy, Inc., 388 U.S. 350 (1967)).

The instant case is inapposite because unlike in Topco, Honeywell is not owned, operated or controlled by its licensee-distributors, the distributors did not have exclusive territories and the alleged conduct that restrained trade (the elimination of ISPI's distributorship) was imposed vertically and unilaterally by Honeywell, not jointly and horizontally by ISPI's co-distributors as was the case in Topco.

In American Motor Inns, Inc. v. Holiday Inns, Inc. 521 F.2d 1230 (3d Cir. 1975), when a franchisee hotel operator applied to franchisor Holiday Inns ("HI"), HI would solicit comments from at least the three existing Holiday Inn hotels nearest the proposed new hotel.  Id. at 1236.  The district court found that in the case of plaintiff American Motor Inns' ("AMI") application for a new hotel in Newark, New Jersey, the objections of existing franchisees "were dispositive" and were "treated as a veto," resulting in the application being denied.  Id. at 1237, 1242.  Each of HI's franchise agreements, also contained a "non-Holiday Inn" clause prohibiting an HI franchisee from owning or operating any hotel or motel that is not a Holiday Inn during the period of the franchise license.  Id. at 1236 n.3.  After AMI's license application for a new Holiday Inn in Newark was denied, AMI asked HI to waive the non-Holiday Inn clause in AMI's license

12

agreements so it could build a non-Holiday Inn hotel on the parcel of land it had already

purchased, and HI refused.  Id. at 1237.  The Third Circuit found that HI's and existing

franchisees' actions in the alleged Newark conspiracy constituted a horizontal

conspiracy.  Id. at 1242.  HI's established practice of providing existing hotel operators

with an absolute veto on new applications (as found by the district court) permitted

competitors at the same level in the market structure to directly determine with whom

they would compete – a classic example of a horizontal conspiracy.  Further, when

considered in connection with the non-Holiday Inn clause, the veto granted to existing

hotel operators functioned to exclude *any* competition from hotel operators who were

parties to license agreements with HI for hotels in different areas, whether it be

competition from HI hotels or non-HI hotels.  In other words, by virtue of signing any

license agreement with HI, the plaintiff in American Motor Inns, was prevented from

opening a competing hotel or motel of any type or brand name in the Newark area after

its license application was denied by HI.

In the instant case, ISPI was subject to no similar absolute veto or exclusion

imposed by other NOTIFIER distributors.  Further, there is no allegation that anything in

the structure of Honeywell's distribution agreements allowed for territorial or geographic

market allocation or prohibited distributors from engaging in other similar businesses as

was the case in American Motor Inns.  Indeed, ISPI continued to service Simplex alarm

systems during the term of its distributorship with Honeywell.  (Compl. ¶ 13.)

In Fontana Aviation, Inc. v. Beech Aircraft Corp., 432 F.2d 1080 (7th Cir. 1970),

the Seventh Circuit reversed the district court's grant of judgment n.o.v. to defendants, an

airline manufacturer and one of its distributors.  Fontana is inapposite because the

13

Seventh Circuit opinion, as well as the district court's initial grant of judgment n.o.v., turned on the issue of damages.  Id. at 1083, 1085-86.  The court, however, stated that "[t]here was evidence in the case before us on which the jury reasonably could have found that for the purpose of lessening competition a rigid territorial division had been worked out on a horizontal basis between the various distributors."  Id. at 1084.  In Fontana, the participation in the conspiracy by Beech, both through its tacit approval as manufacturer and through its own distributor companies, did not change an otherwise horizontal restraint into a vertical restraint.  Id. at 1084-85.  Here, in contrast, Honeywell is not alleged to have participated in any concerted, horizontal action of its distributors.  Rather, Honeywell received complaints that were voiced up the vertical market structure, relayed those complaints back down to ISPI, and ultimately terminated ISPI – all vertical actions.

The additional out-of-circuit cases relied on by ISPI in arguing that the alleged conduct constitutes a horizontal conspiracy and a *per se* violation are distinguishable and unpersuasive.  See Miles Distribs., Inc. v. Specialty Constr. Brands, Inc., 476 F.3d 442, 449-50 (7th Cir. 2007) (stating that evidence of complaints from competing retailers to manufacturer about price competition is insufficient to show a horizontal conspiracy and holding that where evidence "does not suggest that the competing [retailers] conspired to boycott [manufacturer] unless it terminated [plaintiff]," the terminated plaintiff "cannot proceed under a horizontal group boycott analysis"); Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1006, 1011-12 (3d Cir. 1994) (characterizing a restraint intended to target discounters implemented by retailers through a trade association as horizontal conspiracy, but characterizing an effort to target the same discounters by manufacturer as

a vertical conspiracy and noting that the manufacturer's action, even if taken in response to retailer complaints, could have been "entirely consistent with its previously held view of its own self-interest"); Big Apple BMW, Inc. v. BMW of North Am., Inc., 974 F.2d 1358, 1376 (3d Cir. 1992) (noting that competing dealers combined to form a group boycott of manufacturer to pressure manufacturer not to award prospective competitor a dealership and that such a scenario presents a horizontal group boycott as opposed to a vertical restraint); Coca-Cola Co. v. Omni Pac. Co., No. 3:98-CV-0784, 2000 WL 33194867, at *4 (N.D. Cal. Sept. 27, 2000) (noting that manufacturer's territorial restraints have taken on a horizontal character as "the enforcement of these restraints is initiated by, and for the benefit of, the independent bottlers").

3. Bid Rigging

ISPI cites bid rigging cases for the proposition that bid rigging is *per se* illegal under § 1 of the Sherman Act.  (See Pl. Opp'n at 7 (citing Philip Morris Inc. v. Heinrich, No. 95-CV-0328 (LMM), 1996 WL 363156, at *9 (S.D.N.Y. June 28, 1996).)  This is an uncontroversial point.[2]  Rather, the salient issues are whether the conduct complained of in ISPI's complaint constitute a bid rigging agreement and whether the complaint contains "allegations plausibly suggesting (not merely consistent with) agreement" to rig bids.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).

---

[2]    ISPI also cites three criminal bid rigging cases in support of the same point; they add nothing to the argument.  See United States v. Koppers Co., 652 F.2d 290 (2d Cir. 1981) (affirming criminal conviction based on explicit agreement between the only two competitors in the road tar business to allocate territory and pre-determine bid prices, thereby rigging bids for state contracts); United States v. Portsmouth Paving Corp., 694 F.2d 312 (4th Cir. 1982) (affirming criminal conviction for bid rigging where evidence at trial included testimony that competitors held periodic in-person meetings where they explicitly agreed to allocate contracts and not to submit competitive bids); United States v. Flom, 558 F.2d 1179 (5th Cir. 1977) (finding trial errors and remanding for new trial convictions based on periodic meetings where competitors explicitly divided and allocated upcoming contracts for steel re-bars).

The complaint sufficiently alleges that authorized NOTIFIER distributors did not tend to bid on service contracts for customers that had a pre-existing relationship with another distributor (the "incumbent" distributor).  The complaint also contains well-pled allegations that when ISPI submitted low bids against incumbent distributors, those distributors complained to Honeywell and Honeywell complained to and warned ISPI. The allegation that numerous distributors all complained to Honeywell about ISPI's bidding is insufficient to suggest plausibly that the distributors *agreed with each other* not to submit competitive bids.  Supreme Court cases have long been clear that parallel conduct is not sufficient to show agreement and in order to prove a § 1 antitrust claim, a plaintiff must offer evidence tending to exclude the possibility of independent action. Twombly, 550 U.S. at 554 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) and Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984)). Twombly also stated that, at the pleading stage, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Id. at 557; see also Starr v. Sony BMG Music Entm't, 592 F.3d 314, 323-24 (2d Cir. 2010) (quoting Twombly and listing facts which, in addition to parallel conduct, provided factual context raising a suggestion of a preceding agreement). In other words, even at the pleading stage, a plaintiff must state enough facts to *plausibly* suggest agreement, and factual allegations that *possibly* suggest agreement or are merely *consistent with* agreement are insufficient.  Twombly, 550 U.S. at 557, 570.

Here, there could be any number of reasons distributors declined to bid on the service contracts where the NOTIFIER system was installed by another dealer.  There

may be operational efficiencies to be gained through continuity of service providers. Further, as discussed in more detail *infra*, the package of products and services provided to customers by NOTIFIER distributors includes at least three different components: sale of the equipment, installation and service.  (Compl. ¶¶ 6, 10.)  Distributors may not consider it valuable business to attempt to poach the service contract alone from an established customer instead of focusing on customers of competing alarm system brands or developing completely new customers to whom a distributor could provide all three components of a NOTIFIER package.  In short, ISPI's allegations of distributor complaints followed by action on the part of Honeywell are insufficient to constitute a plausible agreement among the distributors to rig bids for service contracts as opposed to mere parallel action.  Nor does the complaint provide factual allegations which, "taken together, place the parallel conduct in a context that raises a suggestion of a preceding agreement."  Starr, 592 F.3d at 323.  Repeating the assertion that the distributors "agreed" and characterizing the conduct as a horizontal conspiracy (Compl. ¶¶ 1, 15, 16, 18, 27) does not, without more, pass muster under Twombly.  See Starr, 592 F.3d at 319 n.2 (stating that the "allegation that defendants agreed" is "obviously conclusory, and is not accepted as true").[3]

---

[3]     The same analysis under Twombly and Starr may apply to the allegations of an "agreement" to terminate ISPI between Honeywell and other NOTIFIER distributors, i.e. the vertical restraint discussed in part III.A.1, *supra*.  Because, even assuming that ISPI has sufficiently alleged a vertical "agreement," the allegations of a vertical conspiracy are insufficient to state a claim under the rule of reason (*infra*, part III.B), the issue of whether ISPI's allegations of a vertical agreement fulfill Twombly's pleading requirements is not dispositive of the instant motion.  The Court merely notes that allegations that Honeywell "'warned' ISPI that it should not compete for the business of clients previously served by other incumbent NOTIFIER distributors" (Compl. ¶ 19), and allegations that Honeywell terminated ISPI's distributorship "[p]ursuant and in response to the other NOTIFIER distributors' requests, demands and/or threats" (Id. ¶ 25) do not necessarily place Honeywell's conduct "in a context that raises a suggestion of a preceding agreement."  Twombly, 550 U.S. at 557; Starr, 592 F.3d at 323.  Therefore, ISPI's allegations of a pre-existing "agreement" between Honeywell and other NOTIFIER distributors, as currently pled, may be conclusory.

4.  <u>Economic Impact of Alleged Horizontal Restraint</u>

Finally, while ISPI defines the relevant market as "the sale, installation and servicing of NOTIFIER fire-detection and alarm system products" (Compl. ¶ 8), ISPI only alleges that service and maintenance contracts were the subject of distributors' agreement not to submit competitive bids (<u>id.</u> ¶¶ 15, 20-24).  The business of authorized NOTIFIER distributors involves not only service and maintenance, but also sale, installation, marketing (<u>id.</u> ¶ 10), inspections, testing, cleaning, calibration (<u>id.</u> ¶ 6), and possibly the provision of peripheral devices (<u>id.</u> ¶ 7).  Not only is the alleged horizontal conspiracy limited to a single brand – NOTIFIER – for which ISPI has not pled a high market concentration or lack of substitute brand, but the alleged horizontal conspiracy related to only one aspect of the intrabrand market for NOTIFIER products and services.  A conspiracy to eliminate competition with respect to one component (within a business involving a package of numerous products and services), within one brand, within an industry in which Plaintiff has not alleged a lack of substitutes is not the type of restraint that is so "manifestly anticompetitive," or that "would always or almost always tend to restrict competition and decrease output," nor is it a restraint with which "courts have had considerable experience" such that a *per se* rule would be appropriate.  <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 886-87 (2007).  Similarly, the alleged restraint on one component of the larger package of goods and services provided by authorized dealers within a single brand is not the type of "naked restraint" that would merit a "quick-look" analysis without an analysis of the industry at issue.  <u>See</u> <u>NCAA v. Bd. of Regents of Univ. of Okla.</u>, 468 U.S. 85, 109-10 (1984); <u>Nat'l Soc. of Prof. Eng'rs v. United States</u>, 435 U.S. 679, 692 (1978).

Because this case lacks key horizontal characteristics that were present in prior cases where manufacturers have been held to have participated in a horizontal conspiracy among dealers, and because Plaintiff failed to sufficiently allege an agreement among distributors to rig bids under the clear standards of <u>Twombly</u>, this case falls squarely under the controlling precedents of <u>Business Electronics</u> and <u>Oreck</u>, holding that a manufacturer's decision to eliminate a dealer is evaluated under the rule of reason, even where that decision was the result of price complaints from competing dealers and based on those competing dealers' impermissible desire to restrain competition.

**B.  Rule of Reason Analysis**

The inapplicability of a *per se* analysis is not dispositive of Defendant's motion. The conduct alleged in the complaint would constitute a violation of § 1 if that conduct "imposes an unreasonable restraint on competition," i.e., if Defendant's conduct is shown to be a violation under the rule of reason.  <u>See</u> <u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 316 (2d Cir. 2008) (describing rule of reason and collecting cases).  Honeywell argues that the complaint fails adequately to allege a § 1 violation under the rule of reason because: (i) it does not allege a relevant product market; (ii) it does not allege a legally cognizable antitrust injury; and (iii) it fails to allege conduct violating the antitrust laws.

1.  <u>Relevant Market</u>

In order to plead an antitrust violation under the rule of reason, a plaintiff must allege a relevant market, including both a product market and a geographic market.  <u>See</u>

Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 480-81 (S.D.N.Y. 2001) (citing

United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377 (1956)).  While

acknowledging that market definition is frequently a fact-intensive inquiry where courts

are hesitant to grant a motion to dismiss, the Second Circuit stated:

> To survive a Rule 12(b)(6) motion to dismiss, an alleged product market
> must bear a rational relation to the methodology courts prescribe to define
> a market for antitrust purposes – analysis of the interchangeability of use
> or the cross-elasticity of demand, and it must be plausible.  Cases in which
> dismissal on the pleadings is appropriate frequently involve either (1)
> failed attempts to limit a product market to a single brand . . . that
> competes with potential substitutes or (2) failure even to attempt a
> plausible explanation as to why a market should be limited in a particular
> way.

Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001) (citing Hack v. President &

Fellows of Yale Coll., 237 F.3d 81, 86 (2d Cir. 2000) and Gianna Enters. v. Miss World

(Jersey) Ltd., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982), internal quotations and footnotes

omitted).

Dismissal is appropriate where the alleged product market is defined without

"reference to the rule of reasonable interchangeability and cross-elasticity of demand" or

where it "clearly does not encompass all interchangeable substitute products even when

all factual inferences are granted in plaintiff's favor."  Chapman v. N.Y. State Div. for

Youth, 546 F.3d 230, 238 (2d Cir. 2008) (quoting Queen City Pizza, Inc. v. Domino's

Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)).

Courts in this district have consistently held that single brand name product

cannot define a relevant market.  Mathias, 152 F. Supp. 2d at 482; Re-Alco Indus., Inc. v.

Nat'l Ctr. for Health Educ. Inc., 812 F. Supp. 387, 391 (S.D.N.Y. 1993); see also Todd,

275 F.3d at 200 n.3 (collecting cases where single-brand market definition was deemed inadequate product market).

Here, ISPI defines the relevant product market as "the sale, installation and servicing of NOTIFIER fire-detection and alarm system products."  (Compl. ¶ 8.)  ISPI does not allege a relevant product market that includes interchangeable substitute products, nor does ISPI even attempt to plead facts that, if true, would provide a plausible explanation as to why the relevant product market should be limited to a single brand of fire-detection and alarm system products.  In response to Honeywell's argument that ISPI failed to define a relevant product market, ISPI merely states that, because it has alleged a *per se* violation, it is not required to define a relevant product market.  (Pl. Opp'n at 10.)  As discussed *supra*, ISPI's assertion that it has alleged a *per se* violation is a legal conclusion, which the Court does not accept as true on a motion to dismiss, and is a conclusion that this Court has rejected (*supra*, part III.A).  In support of its definition of a relevant market based on a single brand, ISPI cites General Motors and Topco, discussed in detail, *supra*, as examples of antitrust violations based on single brands.  But those two cases are inapposite to the relevant market requirement under the rule of reason because they involved *per se* violations based on horizontal restraints.

2.  Antitrust Injury

Under the rule of reason, in order to prove a § 1 violation, a plaintiff must also show an adverse effect on competition, not merely injury to itself.  See Tops Market Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir. 1998) (plaintiff must show defendant's conduct "had an *actual* adverse effect on competition as a whole in the relevant market;

21

to prove it has been harmed as an individual competitor will not suffice." (emphasis in original)).  Like the relevant market definition, the adverse effect on competition is a requirement that must be alleged at the pleading stage and can be the basis for a motion to dismiss.  Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 244-46 (2d Cir. 1997); Re-Alco, 812 F. Supp. at 392.

First, ISPI's complaint does not contain allegations that a lack of competitive bidding in publicly-solicited service and maintenance contracts for NOTIFIER fire-detection systems would have any effect on the overall market for fire-detection systems. Second, even assuming *arguendo* that the relevant market as defined in the complaint is sufficient, the allegations of adverse effect on competition remain inadequate.  There are no factual allegations which, if true, would show:  (i) what percent of service and maintenance contracts are subject to public bidding; (ii) what percent of the market for "sale, installation and servicing" is composed of service and maintenance contracts; or (iii) whether the market for NOTIFIER service and maintenance providers includes businesses that are not authorized NOTIFIER distributors.  In short, even within the narrowly-defined relevant market put forth by Plaintiff, the complaint does not allege facts showing an injury to competition, as opposed to merely showing an injury to Plaintiff.

3.  Conduct Violating the Antitrust Law

Because Plaintiff failed adequately to plead a relevant product market and failed adequately to plead an antitrust injury, and each independently is grounds to dismiss the

complaint under the rule of reason, the Court need not reach Defendant's third argument that the conduct alleged is inadequate to state an antitrust violation.

## IV. Conclusion

Because Plaintiff failed to allege a *per se* antitrust violation and because Plaintiff failed to allege both a relevant product market and an antitrust injury under the rule of reason, Plaintiff's complaint is dismissed. Because "this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)," Porat v. Lincoln Towers Community Ass'n, 464 F.3d 274, 276 (2d Cir. 2006), this dismissal is without prejudice. If Plaintiff elects to re-plead, it shall do so within thirty days of this opinion and order.

IT IS SO ORDERED.

Dated: New York, New York
         May 13, 2010

Robert P. Patterson, Jr.
U.S.D.J.

23

Copies of this order were faxed to:

*Counsel for Plaintiff:*

Arthur S. Linker
Robert William Gottlieb
Katten Muchin Rosenman,LLP (NYC)
575 Madison Avenue
New York , NY 10022
Fax: (212) 940-8776

*Counsel for Defendant:*

Stephen Randall Neuwirth
Quinn Emanuel Urquhart Oliver & Hedges LLP
51 Madison Avenue
22nd Floor
New York , NY 10010
Fax: (212) 702-8200